GREGORY NICOLAYSEN (CA 98544)
27240 Turnberry Lane, Suite 200
Valencia, CA 91355
Phone: (818) 970-7247
Fax: (661) 252-6023
Email: gregnicolaysen@aol.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br><br>Plaintiff )<br><br>v. )<br><br>ROBERT MARTINEZ, )<br><br>Defendant. )<br>_____) | NO.  8:22-CR-00034 FWS-1<br><br>**NOTICE OF MOTION AND MOTION BY DEFENDANT ROBERT MARTINEZ FOR ORDER DISMISSING INDICTMENT WITH PREJUDICE DUE TO GOVERNMENT'S FAILURE TO FUND CJA DEFENSE**<br><br>DATE:   November 20, 2025<br>TIME:    2:30 p.m.<br>COURTROOM: The Hon Fred W. Slaughter |

TO: THIS HONORABLE COURT AND ASSISTANT U.S. ATTORNEYS GREGORY SCALLY AND GREGORY STAPLES :

NOTICE IS HEREBY GIVEN that on November 20, 2025 at 2:30 p.m. defendant Robert Martinez will respectfully move this Court for an order dismissing all charges against him with prejudice based on the federal

government's failure and refusal to fund defendant's defense under the Criminal Justice Act.

This motion is based on this notice of motion, the accompanying memorandum of points and authorities, and all evidence the Court may permit counsel to present at the hearing on the motion.

DATED: October 14, 2025            _____/S/_____
                                   **GREGORY NICOLAYSEN**
                                   **Attorney for Defendant**
                                   **Robert Martinez**

# TABLE OF CONTENTS

|  |  | Page(s) |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. Opening Statement | 1 |
| | B. The Criminal Justice Act | 1 |
| | C. The CJA Funding Crisis | 5 |
| II. | DISMISSAL IS WARRANTED BECAUSE THE GOVERNMENT'S FAILURE TO FUND CJA DEFENSE VIOLATES THE SIXTH AMENDMENT EMBODIED WITHIN THE CRIMINAL JUSTICE ACT AND CONSTITUTES STRUCTURAL ERROR | 7 |
| III. | DISMISSAL IS WARRANTED UNDER THE COURT'S INHERENT SUPERVISORY AUTHORITY | 11 |
| IV | CONCLUSION | 12 |

# TABLE OF AUTHORITIES

**Cases**                                                                                          Page(s)

Arizona v. Fulminante, 499 U.S. 279, 111 S. Ct. 1246 (1991)                                        9

Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792 (1963)                                           1, 9, 10

Knoller v. Miller, 2014 U.S. Dist. LEXIS 91146,

    (N.D. Cal. July 3, 2014)                                                                      10

King v. Soto, 2017 U.S. Dist. LEXIS 85165, (N.D. Cal. June 2, 2017)                                10

McNabb v. United States, 318 U.S.332, 63 S.Ct. 608,

    87 L.Ed 819 (1943)                                                                            11

Weaver v. Massachusetts, 582 U.S. 286

    137 S. Ct. 1899, (2017)                                                                       10

United States v. Adams, 2025 U.S. Dist. LEXIS 187847                                               2

    (D.D.C. Sep. 24, 2025).

United States v. Burk, 2014 U.S. Dist. LEXIS 84474                                                 3

    (W.D. Tex. June 18, 2014).

United States v. Bundy, 968 F.3d 1019 (9th Cir. 2020)                                              11

United States v. Barrera-Moreno, 951 F.2d 1089 (9th Cir. 1991)                                     11

United States v. Struckman, 611 F.3d 560 (9th Cir 2010)                                            11

United States v. Walter-Eze, 869 F.3d 891 (9th Cir. 2017)                                          9

**STATUTES**

Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A.                                                   1, 2, 3

I.

INTRODUCTION

A.  Opening Statement

The federal government speaks with one voice.  The same government that files prosecutions is also obligated to pay for the defense of financially qualified defendants under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A.  You prosecute; you pay.  You don't pay; you don't prosecute.  Complaint / Indictment dismissed with prejudice.  That is the essential message that must be sent by the federal judiciary to the White House and Congress.

As we enter the fourth month of a CJA funding crisis that has seen CJA attorneys working without compensation since early July 2025, combined with an ongoing shutdown of the federal government that has no end in sight, CJA counsel for defendant Robert Martinez files this motion requesting dismissal of all charges against him with prejudice.

B.  The Criminal Justice Act

On March 18, 1963, the U.S. Supreme Court issued its decision in Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792 (1963), which held that the Sixth Amendment's guarantee of counsel is one of the fundamental and essential rights made obligatory upon the states by the Fourteenth Amendment.  Responding to this landmark ruling, on August

1

20, 1964, Congress enacted the Criminal Justice Act, 18 U.S.C. § 3006A ("CJA"), "[t]o promote the cause of criminal justice by providing for the representation of defendants who are financially unable to obtain an adequate defense in criminal cases in the courts of the United States." Pub.L. 88-455, 78 Stat. 552.[1] Beyond furnishing counsel, the CJA specifies that "[r]epresentation shall include counsel and investigative, expert, and other services necessary for adequate representation." 18 U.S.C. § 3006A(a). *See,* United States v. Adams, 2025 U.S. Dist. LEXIS 187847, at *17 (D.D.C. Sep. 24, 2025).

The enactment of the CJA reflects a Congressional recognition of a constitutional responsibility to provide counsel for indigent defendants prosecuted in federal courts. The Preamble to the Criminal Justice Act (CJA) Guidelines ("CJA Guidelines"), which contain "policies and procedures . . . of the Judicial Conference of the United States for the administration and operation of the [CJA]," expressly observes that "[t]he Sixth Amendment to the United States Constitution guarantees an accused the right to representation by counsel in serious criminal prosecutions." These guidelines, issued through the Judicial Conference of the United States,[2] provide the operational framework

---

[1] **Codified as amended at 18 U.S.C. § 3006A. The original CJA only created compensation for private attorneys; the statute was amended in 1970 to include federal and community defender offices.).** *See,* **The 2017 Report of the Ad Hoc Committee to Review the Criminal Justice Act , fn. 48, at page 13.**

[2] **The Judicial Conference of the United States is the national policymaking body for the federal courts. Established by Congress in 1922, it plays a crucial role in the administration and governance of the judicial branch of the U.S. government.** *See,* **https://www.uscourts.gov/administration-policies/governance-judicial-conference**

by which "the CJA establishes a comprehensive system for appointing *and compensating* legal representation for accused persons who are financially unable to retain counsel in federal criminal proceedings." U.S. Courts, Judiciary Policies, CJA Guidelines (Preamble) (Italics Added).[3]

The compensation procedures set forth in the CJA Guidelines serve to implement the mandate of the CJA which, by it terms, entitles counsel and outside service providers to be compensated. *E.g.,* 18 U.S.C.S. § 3006A(d)(1) ["Hourly rate. Any attorney appointed pursuant to this section, . . . shall, at the conclusion of the representation or any segment thereof, be compensated at a rate not exceeding . . ."]; CJA Guidelines, Chapter 2, Section 230 ("Compensation and Expenses of Appointed Counsel").[4] Prior to 1964, attorneys appointed by the Court to aid in the defense of indigent criminal defendants "render[ed] . . . their legal services pro bono publico." Dudley B. Bonsai, The Criminal Justice Act-1964 to 1976, 52 Ind. L.J. 1, 135 (1976), cited in United States v. Burk, 2014 U.S. Dist. LEXIS 84474, at *18-19 (W.D. Tex. June 18, 2014).

To implement its statutory objectives at the district court level, subsection (a) of the CJA directs each federal district to develop a CJA plan:

---

[3] https://www.uscourts.gov/administration-policies/judiciary-policies/criminal-justice-act-cja-guidelines

[4] https://www.uscourts.gov/administration-policies/judiciary-policies/guidelines-administering-cja-and-related-statutes-6

3

> (a) Choice of plan. Each United States district court, with the approval of the judicial council of the circuit, shall place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation in accordance with this section. Representation under each plan shall include counsel and investigative, expert, and other services necessary for adequate representation.

In the Central District of California, the 43-page CJA Plan ("Plan") is available on the Court's web site.[5] Consistent with the statutory mandate, the plan expressly provides for compensation to CJA attorneys (at page 34):[6]

> X. CJA COMPENSATION AND FUNDING FOR NEEDED SERVICES
> A. Court Compensation Policies
> Providing fair compensation to appointed counsel is a critical component of the administration of justice. Attorneys appointed under the CJA must be compensated for time expended in court and time reasonably expended out of court, and reimbursed for expenses reasonably incurred.

C.  The CJA Funding Crisis

The existence of a CJA funding crisis needs no explanation. The U.S. Courts web

---

[5] https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO%2024-07.pdf

[6] The Plan includes outside service providers in the definition of "Representation." (Plan at section III-G, page 4).

4

site acknowledges that "Criminal Justice Act (CJA) panel attorney funds were depleted around July 3, 2025":[7]

> Fiscal Year 2025 Criminal Justice Act (CJA) panel attorney funds were depleted around July 3, 2025. Panel attorney payments have been deferred (except for one batch of payments on September 18) since that date. The deferred payments from fiscal year 2025, and new fiscal year 2026 panel attorney payments, continue to be deferred during the current lapse in appropriations. Panel attorney payments will resume when a continuing resolution is passed by Congress and signed into law by the President.

The depletion of funds starting in July 2025 reflects the grim reality that there have been not one, but two, successive budget crises, the first occurring in March 2025 when the continuing resolution passed by Congress kept CJA funding levels at year 2024 levels, thus accelerating a depletion of funds prior to September 30, when the fiscal year ended. Shortly after the funds ran out in early July, the U.S. Courts web site expressly acknowledged this alarming development, which presaged what was to come:

---

[7] https://www.uscourts.gov/about-federal-courts/defender-services/cja-panel-attorney-funds-information-fy-2025

5

> The continuing resolution to fund the government for fiscal year 2025 passed by Congress in March froze all Judicial Branch funding at the FY 2024 level, which resulted in panel attorney funding running out unusually early. Because of the hard freeze funding level, funding is not available within other Judiciary accounts to address the funding gap.

Article, "Funding Crisis Leaves Defense Lawyers Working Without Pay," (U.S. Courts, Judiciary News, July 15, 2025).[8]

What began in early July is now well into its fourth month, with no end in sight. By mid-September 2025, prior to the end of the court's fiscal year and prior to the onset of the government shutdown, the U.S. Courts web site was already anticipating that the funding crisis could worsen; and they were right. Article, "Judiciary Budget Crisis Could Worsen, Conference Is Told" (U.S. Courts, Judiciary News, September 16, 2025).[9]

The hardship on CJA attorneys in this district cannot be overstated; and it has already garnered local media attention within the legal community. Article, "3 Months Without Pay, Federal Indigency Lawyers Pushed To The Brink," (Los Angeles Daily Journal, October 2, 2025).[10] The impact on CJA attorneys nationwide has been no less

---

[8] https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay

[9] https://www.uscourts.gov/data-news/judiciary-news/2025/09/16/judiciary-budget-crisis-could-worsen-conference-told

[10] https://www.dailyjournal.com/articles/387854-3-months-without-pay-federal-indigency-lawyers-pushed-to-the-brink

severe and has likewise gained media attention.  E.g., Articles, "The Impact of Criminal Justice Act Payment Delays," (NACDL, September 25, 2025)[11]; "Federal defense attorneys face three months of no pay," (The Indiana Lawyer, August 13, 2025).[12]

## II.
## DISMISSAL IS WARRANTED BECAUSE THE GOVERNMENT'S FAILURE TO FUND CJA DEFENSE VIOLATES THE SIXTH AMENDMENT EMBODIED WITHIN THE CRIMINAL JUSTICE ACT AND CONSTITUTES STRUCTURAL ERROR

Congress and the White House have inflicted severe financial harm on the American people and continue to do so with each passing day of the federal government shutdown.  Viewed specifically from a CJA perspective, it is utterly deplorable that the Executive and Legislative branches have abdicated their constitutional responsibilities under the Criminal Justice Act by financially abandoning the nationwide community of CJA panel attorneys.  This motion is being filed four-plus months into the budget crisis with no foreseeable end.  It is the absence of any light at the end of the tunnel that heightens the magnitude of the constitutional violation to a degree where dismissal is the only option.

---

[11] https://www.nacdl.org/Content/The-Impact-of-Criminal-Justice-Act-Payment-Delays

[12] https://www.theindianalawyer.com/articles/federal-defense-attorneys-face-three-months-of-no-pay

The government's statutory violation of the CJA cannot be disputed. As discussed above, the CJA expressly entitles appointed attorneys and outside service providers to compensation, which is a core underpinning of the statute's embrace of Sixth Amendment principles under Gideon. While the U.S. Department of Justice ("DOJ") is not itself responsible for the budget crisis, the government here should be viewed as a singular entity that speaks with one voice. From this perspective, the failure of the Executive and Legislative branches to resolve the crisis should be deemed no less a failure by DOJ, an agency within the Executive branch, and thus result in a forfeiture of DOJ's authority to prosecute. In short, the government's violation of the CJA is DOJ's violation, warranting dismissal of this prosecution.

It comes as no surprise that the DOJ ignores the funding crisis. The local United States Attorney's Office ("USAO") has continued to prosecute this, and every other previously-filed case, in a business-as-usual mode, as if no crisis existed. Indeed, the USAO continues filing new criminal complaints and indictments on an almost daily basis, unabated by any concern about the impact of existing and new filings on the capacity of the CJA Panel to operate in this fiscal climate. The veritable "pink elephant on the couch" appears to be of no importance in the USAO's enforcement agenda.

The unwavering commitment of CJA attorneys, who continue to work through this period of extreme hardship, has effectively masked the USAO's conspicuous indifference to the CJA budget crisis. Such professionalism is no substitute for the

government's constitutional and statutory obligations—a commitment the government evidently takes for granted, especially with no end in sight to the crisis. While the Ninth Circuit maintains a presumption that a lawyer "will subordinate his pecuniary interests and honor his primary professional responsibility to his clients in the matter at hand," United States v. Walter-Eze, 869 F.3d 891, 902 (9th Cir. 2017), this principle rests on circumstances in which defense counsel has a choice between the two interests, not a scenario like the one at hand where compensation to defense counsel dangles at the mercy of Washington politics. The only redress for this gross inequity is dismissal with prejudice.

Under these circumstances, the constitutional ramifications of the government's violation of the CJA extend into the realm of structural error. While Gideon did not expressly utilize the term structural error, the opinion gave this doctrine its foundational platform in holding that provision of counsel in all criminal cases was "a fundamental right, essential to a fair trial," and thus obligatory on the states by the Fourteenth Amendment. Gideon, 372 U.S. at 343-344.

Gideon's holding would later be recognized by the Supreme Court as the quintessential example of structural error, a doctrine promulgated in Arizona v. Fulminante, 499 U.S. 279, 111 S. Ct. 1246 (1991), where the Supreme Court identified two kinds of constitutional error in a criminal proceeding - structural error and trial error. Structural error is a "defect affecting the framework within which the trial proceeds,

rather than simply an error in the trial process itself." Fulminante, 499 U.S. at 310. Accordingly, where a criminal proceeding is undermined by a structural error, the "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence," and the defendant's conviction must be reversed. Id. In Weaver v. Massachusetts, 582 U.S. 286, 294-95, 137 S. Ct. 1899, 1907-08 (2017), the Supreme Court explained that

> The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it "affect[s] the framework within which the trial proceeds," rather than being "simply an error in the trial process itself." Id. [Fulminante, 499 U. S.] at 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302. For the same reason, a structural error "def[ies] analysis by harmless error standards." Id., at 309, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (internal quotation marks omitted).

Citing Gideon, the Court in Fulminante recognized that the complete deprivation of counsel is structural error because "the entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant...." 499 U.S. at 307, 309-310, cited in Knoller v. Miller, 2014 U.S. Dist. LEXIS 91146, at *44-45 (N.D. Cal. July 3, 2014). See, King v. Soto, 2017 U.S. Dist. LEXIS 85165, at *12-13 (N.D. Cal. June 2, 2017)(discussing Fulminante).

Despite efforts by the USAO to conceal the CJA budget crisis with its business-as-usual agenda, the reality cannot be ignored, that the impact of nonpayment, coupled

with the lack of a foreseeable resolution, has risen to the level of deprivation of counsel, notwithstanding the CJA panel's commitment to serve clients. Accordingly, this court should find that the government's actions in failing to fund CJA defense constitutes structural error and dismiss all charges with prejudice.

III.

## DISMISSAL IS WARRANTED UNDER THIS COURT'S INHERENT SUPERVISORY AUTHORITY

A court may dismiss an indictment under its inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." United States v. Bundy, 968 F.3d 1019, 1030 (9th Cir. 2020) [quoting United States v. Struckman, 611 F.3d 560, 574 (9th Cir. 2010)]. "The court's exercise of its supervisory powers protects the integrity of the federal courts and prevents the courts from 'making . . . themselves accomplices in willful disobedience of law.'" Id. [quoting McNabb v. United States, 318 U.S. 332, 345, 63 S. Ct. 608, 87 L. Ed. 819 (1943)]. "A district court can dismiss an indictment under its supervisory powers even if 'the conduct does not rise to the level of a due process violation.'" Id. [quoting United States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir. 1991)].

The severe circumstances presented by the CJA budget crisis satisfy all three

11

criteria to warrant a dismissal with prejudice based on this court's inherent supervisory powers. First, for the reasons previously discussed, the government's failure to fund CJA defense constitutes a violation of a recognized statutory or constitutional right under the CJA. Second, while the applicable criterion generally applies to a conviction, the crippling impact of the budget crisis necessitates the intervention of the federal courts to preserve judicial integrity in the face of Congressional abdication and Executive indifference. Third, a dismissal with prejudice will send a loud message to those who hold the purse strings in Washington, D.C. by making it clear that the federal judiciary will not tolerate the economic paralysis of the federal indigent defense community. In so doing, this action will serve to deter future misconduct by the government

IV.

CONCLUSION

Based on the facts and arguments presented herein, this Court should dismiss all charges against defendant Robert Martinez with prejudice.

DATED: October 14, 2025                Respectfully Submitted,


                                       _____/S/_____
                                       GREGORY NICOLAYSEN
                                       Counsel for defendant,
                                       Robert Martinez